The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with modifications for clarity and the modification of disability payments.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Liberty Mutual Insurance Company is the carrier on risk.
4. Plaintiff's average weekly wage is $400.00, which yields a compensation rate of $266.67 per week.
5. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
6. Industrial Commission Forms were stipulated into evidence as Stipulated Exhibit 2.
7. Documentation from plaintiff's employment file was stipulated into evidence as Stipulated Exhibit 3.
8. Plaintiff's recorded statement was stipulated into evidence as Stipulated Exhibit 4.
9. Plaintiff's time cards were stipulated into evidence as Stipulated Exhibit 5.
10. The issues to be determined are: (i) whether plaintiff sustained a compensable injury by accident arising out of and in the course of his employment on September 3, 1999; and (ii) if so, what compensation, if any, is due plaintiff?
 ***********
The Full Commission adopts the findings of fact of the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was twenty-three years old and had an eleventh grade education. Plaintiff has not received a high school diploma or a GED. Plaintiff attended Columbia High School and played high school football and baseball.
2. At age eighteen plaintiff was diagnosed with bilateral hernias, which were repaired at Pitt County Memorial Hospital in June 1996 by Dr. Robert W. Youngblood.
3. Upon recovering from the hernia repair, plaintiff returned to playing football his senior year in high school and did not have any hernia problems after the repair.
4. Plaintiff's work history includes farming for two years. He then took a job with Rose Welding and worked as a welder for approximately four to six months.
5. After leaving Rose Welding, plaintiff worked for M H Pallet, Bill Black and Balford Beatty.
6. Plaintiff obtained experience in bridge construction while working as a pile driver for Balford Beatty on the Manns Harbor Bridge.
7. On August 9, 1999 plaintiff became employed by defendant-employer as a pile driver to work on an Intercoastal Waterway bridge between Gum Neck and Fairfield, North Carolina. Plaintiff was hired to drive pilings; however, his principal responsibility at the time of his accident was driving a tractor-trailer hauling girders for the bridge. Plaintiff also assisted in setting the girders.
8. On September 3, 1999, Hurricane Dennis was approaching the North Carolina coast. Plaintiff was working that day and after lunch he was instructed to secure the jobsite in preparation for the hurricane. Plaintiff had never performed this type of work.
9. Plaintiff stacked four or five 4x8 sheets of plywood and looked for something to place across the plywood to secure it against the wind. Plaintiff saw an anchor chain and decided the weight of the chain would be sufficient to hold the wood.
10. Plaintiff walked over to the chain, bent down and when he attempted to lift the chain, he realized the chain was heavier than expected. The chain weighed over 300 pounds. Plaintiff felt a pop as he pulled the chain. Plaintiff felt nagging pain in his groin area and thought that he had pulled a muscle which would resolve in a matter of days.
11. On September 13, 1999, plaintiff went to M. K. Jeon, M.D., his family physician. Plaintiff indicated to his employer that he had a cold and needed to go to the doctor. Plaintiff was instructed to arrange the appointment with Dr. Jeon and to get an out-of-work note from the doctor.
12. Plaintiff indicated to Dr. Jeon that he had bilateral hernias in the past and that he thought the hernia had come back on the right side. Dr. Jeon examined plaintiff and determined that plaintiff did have a hernia.
13. Plaintiff informed defendant-employer of the results of his appointment with Dr. Jeon on the same day as the appointment. Christy Davenport, defendant-employer's field administrator, scheduled an appointment for plaintiff to see Charles Boyette, M.D., on September 14, 1999.
14. Dr. Boyette determined there was a great deal of pain and tenderness in plaintiff's groin area and a bulge, with the right side more tender than the left. Dr. Boyette diagnosed plaintiff with bilateral inguinal hernias and felt that this was the result of plaintiff's injury while picking up the anchor chain.
15. Dr. Boyette referred plaintiff to Dr. Youngblood, the general surgeon at Pitt Memorial Hospital who performed the prior hernia surgery on plaintiff.
16. Dr. Boyette returned plaintiff to work on light duty not lifting more than five pounds.
19. Plaintiff delivered Dr. Boyette's return to work note to Christy Davenport and plaintiff spoke to Malcolm Hathaway, Jr., known as "M.D.," about his return to work. Mr. Hathaway was the job supervisor for the bridge project. Plaintiff indicated to Mr. Hathaway that he injured himself on the job and told Mr. Hathaway about his light duty work restrictions. Defendant did not offer plaintiff any light duty work.
20. On September 29, 1999, plaintiff was terminated by defendant-employer for being absent without calling for three consecutive days.
21. Plaintiff had good cause not to call defendant-employer during this time period based upon his health condition, his work restrictions, and defendant-employer's failure to offer him work within his restrictions.
22. On December 6, 1999 plaintiff returned to Dr. Youngblood and related to Dr. Youngblood that he had done well since the first surgery until he lifted a heavy chain at work and suffered pain in his lower abdomen, both on the right and left side, more severe on the right. Since that time plaintiff had continuing pain and noticed some bulging in the area of the lower portion of his right inguinal ligament. Plaintiff had bilateral groin pain, more severe on the right than the left, and any attempt at lifting, straining, or stretching reproduced the pain. Dr. Youngblood's examination disclosed that the whole medial portion of the lower abdomen just above the inguinal ligament seemed to bulge outward. Dr. Youngblood prescribed medication and scheduled follow-up appointments.
23. After plaintiff's termination on September 29, 1999, he was able to work as a carpenter for A.R. Chesson for approximately three weeks at light duty. Plaintiff worked forty hours a week at the rate of $6.00 an hour.
24. Plaintiff testified that he was capable of performing the work at A.R. Chesson and that the only reason he left the job was because the project on which he was working ended. At the time that plaintiff worked for A.R. Chesson he had partial earning capacity which continued after the job was finished and until his surgery.
25. On March 2, 2000, Dr. Youngblood performed surgery to repair the recurrent bilateral hernias. The silk sutures from the first hernia repair had actually pulled loose and the tissues were torn. Dr. Youngblood indicated plaintiff had had a very significant force to disrupt a repair.
26. Dr. Youngblood indicated the most reasonable explanation for the hernia was the lifting of the anchor chain.
27. Dr. Youngblood instructed plaintiff that he should not do manual labor, lifting or strenuous exercise, including the type of work he had previously performed. Plaintiff was to comply with these restrictions for three to four weeks after the surgery.
28. Plaintiff was out of work as a result of his bilateral hernia repair surgery for approximately one month.
29. As of April 1, 2000 plaintiff had reached maximum medical improvement and accepted a position with Barnhill Construction Company working forty hours a week at $9.00 an hour with some overtime. Plaintiff's primary responsibility for Barnhill Construction was as a flagman. Plaintiff's wages at Barnhill were the same or greater than the wages he earned at defendant-employer prior to his lifting injury. As of April 1, 2000, plaintiff regained wage earning capacity.
30. In June 2000, plaintiff began employment as a welder with Coleson's Welding. Plaintiff is paid $13.25 per hour for a 40-hour workweek, which is a greater wage than his preinjury wage. Plaintiff continued in this employment at the time of the hearing before the Deputy Commissioner.
31. Plaintiff described feeling a pop and subsequent nagging pain right above his groin area after pulling on the heavy chain on September 3, 1999. Ten days later plaintiff received medical treatment for the pain and tenderness in his groin. The Full Commission finds that plaintiff's testimony regarding the specific incident leading to his bilateral hernias is credible.
32. After considering the greater weight of the evidence, the Full Commission finds that plaintiff's bilateral hernias appeared suddenly on or about September 3, 1999 as the result of a specific traumatic incident of the work assigned. Plaintiff's prior bilateral hernias had resolved and he did not have a hernia prior to the injury by accident on September 3, 1999.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In order to recover compensation for a hernia, plaintiff must prove that (1) there was an injury resulting in hernia or rupture; (2) the hernia or rupture appeared suddenly; (3) the hernia or rupture immediately followed an accident or specific traumatic incident; and (4) that the hernia or rupture did not exist prior to the accident for which compensation is claimed. N.C. Gen. Stat. § 97-2(18); Long v.Morganton Dyeing Finishing Co., 321 N.C. 82, 361 S.E.2d 575 (1987). Compensation may be awarded if the pain immediately followed the accident, even if the hernia was not discovered until some days thereafter. Ussery v. Cotton Mills, 201 N.C. 688, 161 S.E. 307 (1931).
2. As result of the incident on September 3, 1999, plaintiff sustained bilateral hernias that appeared suddenly and immediately following an injury by accident within the course and scope of his employment with defendant-employer as result of a specific traumatic incident of work assigned. N.C. Gen. Stat. § 97-2(18).
3. As a result of plaintiff's specific traumatic incident on September 3, 1999, plaintiff is entitled to payment by defendants of all medical expenses related to the treatment of the bilateral hernias. N.C. Gen. Stat. § 97-25.
4. Plaintiff was justified in not returning to work due to defendant-employer's refusal to provide work within his restrictions. N.C. Gen. Stat. § 97-32.
5. As the result of his compensable injury, plaintiff was partially disabled from work and is entitled to receive temporary partial disability compensation for two-thirds of the difference in wages between his pre-injury average weekly wage received from defendant-employer and wages received from A.R. Chesson for the period from the date of his discharge from employment on September 29, 1999 through March 1, 2000. N.C. Gen. Stat. § 97-30.
6. As the result of his compensable injury by accident, plaintiff was temporarily totally disabled from any employment and is entitled to receive temporary total disability compensation from the date of his hernia surgery, March 2, 2000, until April 1, 2000, when plaintiff reached maximum medical improvement and regained his wage earning capacity by returning to work at wages greater than his preinjury wages. N.C. Gen. Stat. § 97-29.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For his temporary partial disability, plaintiff is entitled to receive two-thirds of the difference between his wages received from defendant-employer and wages received from A.R. Chesson, $106.67 per week, for the period from September 29, 1999 through March 1, 2000. Said amount shall be paid in lump sum subject to attorney's fees approved in Paragraph 4.
2. For his total disability, plaintiff is entitled to temporary total disability compensation at the rate of $266.67 per week from March 2, 2000 until April 1, 2000. Said amount shall be paid in a lump sum subject to attorney's fee approved in Paragraph 4.
3. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury on September 3, 1999.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraphs 1 and 2 of this AWARD is approved for plaintiff's counsel and shall be deducted 25% from the lump sum due plaintiff and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This the ___ day of September 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mhb